1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   AARON ANTHONY VALADEZ,                     No.  2:16-cv-02662 WBS KJN

12              Petitioner,

13        v.                                     FINDINGS & RECOMMENDATIONS

14   MARION SPEARMAN,

15              Respondent.

16

17   I.  Introduction

18          Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2012 conviction for

20   mayhem, assault and criminal street gang activity.  Petitioner was sentenced to seven years-to-

21   life plus ten years, four months in state prison.  Petitioner claims that the admission of expert

22   witness fingerprint evidence violated his constitutional rights to due process and a fair trial, and

23   that the evidence against him was insufficient, thereby violating his due process rights.  After

24   careful review of the record, this court concludes that the petition should be denied.

25   II.  Procedural History

26          On August 20, 2012, a jury found petitioner guilty of aggravated mayhem (count 1 – Cal.

27   Pen. Code § 205), assault likely to produce great bodily injury (count 3 – Cal. Pen. Code

28   § 245(a)(1)), and criminal street gang activity (count 4 – Cal. Pen. Code § 186.22(a)); further, the

                                                 1

jury found true a criminal street gang activity enhancement (Cal. Pen. Code, § 186.22(b)) as to counts 1 and 3.  On November 2, 2012, petitioner was sentenced to a determinate term of ten year, four months, as well as an indeterminate term of seven years-to-life in state prison.  (ECF No. 16, Lodged Docs. 3 at 835-38, 858-62, 864 & 5 at 5-8.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District.  The Court of Appeal affirmed the conviction on July 20, 2015.  (ECF No. 16, Lodged Doc. 24.)

Petitioner filed a petition for review in the California Supreme Court, which was denied on November 10, 2015.  (ECF No. 16, Lodged Docs. 25 & 26.)

Petitioner filed the instant petition on November 9, 2016.  (ECF No. 1.)  Respondent answered on March 23, 2017.  (ECF No. 13.)

III.  Facts[1]

In its partially published memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Early in the morning on September 20, 2009, Osvaldo Hernandez drove his friend Victor Arechiga to a gas station with a convenience store to purchase beer. He parked near the front of the store, and Arechiga went in to make the purchase. Arechiga left the store with two 30 packs of beer and may have said something to a couple of girls as he passed by them.
>
> As Arechiga put the beer in the backseat of Hernandez's car, a group of Norteño gang members rushed the car. One of the men yelled, "Are you a scrap?," using a disrespectful term for Sureños, and someone took the beer from the backseat. Meanwhile, the men began punching and kicking Hernandez as he sat in the driver's seat. Hernandez was not able to get out of the car because one of the men pushed against the driver's door. As Hernandez was being blocked from getting out of the car through the driver's door, someone entered the vehicle through the passenger side door and slashed Hernandez's cheek with a sharp object. It looked like his face was "split in half." After the slashing, the group of men fled.
>
> Jennifer Hernandez, who is not related to Osvaldo Hernandez, was

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Rivas</u>, No. C072621, July 20, 2015, a copy of which was lodged by respondent as Document 24 (<u>see</u> ECF No. 16) on December 28, 2018.

2

at the gas station when the attack took place. She saw a group of young men who were rambunctious and cocky, and she saw four or five men attacking the car that Hernandez was in.

Woodland Police Department detectives retrieved a surveillance video showing the attack at the gas station. In the video, which is grainy and pixelated, Arechiga is seen putting the beer in the backseat of the car, while Hernandez waits in the driver's seat. At least four men approach the car, chase off Arechiga, grab the beer from the backseat, punch and kick Hernandez, and flee. Specifically, a man is seen pushing the driver's door shut, with his hand on the driver's side window, to keep Hernandez in the car. Another man is seen entering the front seat through the passenger's side and making a motion toward Hernandez with his right hand.

Based on a tip from an anonymous caller, the detectives contacted defendant Rivas's probation officer, Mike Ha, and had him watch the video to see if he could identify anyone. After watching the video several times, Probation Officer Ha was able to identify defendant Rivas and another man in the video.

Osvaldo Hernandez identified defendant Rivas at trial as the one who slashed his face. And Jennifer Hernandez identified defendant Rivas as one of the men gathered in the rowdy and rambunctious group at the gas station.

Two days after the attack on Hernandez, a community service officer with the Woodland Police Department identified six latent fingerprints on Hernandez's car, including a print from the outside of the driver's side window.

In May 2010, fingerprint analysts from the California Department of Justice identified a palm print taken from the outside of the driver's side window of Hernandez's car as matching a known palm print from defendant Valadez.

Defendants Rivas and Valadez are Norteño criminal street gang members.

People v. Rivas, 238 Cal. App. 4th 967, 970-72 (2015).

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

////

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

////

---

[2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny

6

relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 101. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

V. Petitioner's Claims

A. *The Fingerprint Evidence*

Petitioner claims that his rights to a fair trial and due process of law under the Sixth and Fourteenth Amendments were violated when the prosecution's expert was permitted to testify about the palm print found on the victim's car over petitioner's objections. (ECF No. 1 at 5, 16-17.) Respondent counters that the state court's rejection of petitioner's claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, thereby precluding relief. (ECF No. 13 at 17-26.)

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Defendant Valadez contends the trial court committed prejudicial error when it admitted fingerprint evidence connecting him to the crimes because the scientific community has rejected the reliability of fingerprint evidence. The fingerprint evidence in this case was essential to the prosecution's case because the only two circumstances that connected defendant Valadez to the crimes were his membership in the same gang as the other assailants and the presence of his palm print on the victim's car. Specifically, defendant Valadez argues that (1) fingerprint identification has not been shown to be reliable and (2) there was no adequate foundation for the expert testimony given in this case that the latent print on the car was from defendant Valadez's palm. The contention is without merit because (1) fingerprint evidence is not so unreliable that it must be excluded

7

and (2) the foundation laid for the fingerprint evidence in this case was sufficient.

## A. *Procedural Background*

Defendant Valadez filed a motion in limine to exclude fingerprint evidence at trial. He claimed that "[(1)] latent fingerprint identification evidence is subject to *Kelly*[1] admissibility requirements, [(2)] fingerprint identification evidence is no longer generally accepted in the scientific community, [and (3)] there is no generally accepted statement that can be made regarding the significance of a match between a latent fingerprint and a known print...." In support of defendant Valadez's motion, he reviewed the history of fingerprint evidence in California courts and asserted that "[t]he unproven assumption that the fingerprint process is reliable can no longer be sustained." Defendant Valadez argued that fingerprint evidence is suspect because (1) there is no scientific research showing that no two individuals' fingerprints have the same ridge characteristics, which are the primary characteristics used to identify a person's fingerprint, and (2) there has been no proof that a fingerprint analyst can reliably identify a person by comparing a known fingerprint sample to a fingerprint that is subject to an "unknown degree of distortion and variability...." Defendant Valadez also claimed that fingerprint evidence is unreliable because there has been no testing done in determining the reliability of fingerprint analysis, including development of statistical data and uniform standards.

[FN 1.] *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).

Defense counsel told the court that the motion was based, "most fundamental[ly]," on the argument that "scientific evaluation of fingerprint evidence" was "undergoing radical changes." The trial court refused to hold an evidentiary hearing on fingerprint evidence. It noted that there is no requirement to hold a *Kelly* hearing because fingerprint analysis is not a novel scientific technique. The court said that if the fingerprint analyst was successfully qualified as an expert, the court would allow her to offer an opinion concerning whether defendant Valadez's palm print matched the one taken from the car and defense counsel could cross-examine on the foundation for that opinion.

At trial, the prosecution called Norma Vidales, a community services officer for the Woodland Police Department, to testify concerning fingerprint evidence that she collected. She had been doing crime scene investigations for eight years, including photography, fingerprinting, sketching, and other evidence collection. She described how a fingerprint is processed from a crime scene and sent to the California Department of Justice for analysis.

On September 22, 2009, two days after the assault on Hernandez, Vidales was sent to collect evidence from Hernandez's car. She took pictures of the car and lifted six fingerprints, one of which, People's exhibit No. 4, was from the exterior of the driver's side window.

The prosecution also called Elizabeth Troxel, an employee of the California Department of Justice, to testify as an expert on latent fingerprint analysis. Before the court qualified her as an expert, both the prosecutor and counsel for defendant Valadez questioned her concerning her training and experience. She had worked for the California Department of Justice for four years and, before that, for the Sacramento Police Department for 14 years. She completed various courses on crime scene investigation, including basic and advanced latent fingerprint comparisons. She has never done scholarly research on fingerprint analysis, but has read published studies on the subject. Her proficiency in properly comparing fingerprints is regularly tested. She is certified as a fingerprint analyst by the International Association for Identification. And she has done fingerprint comparisons "thousands or tens of thousands of times."

Defendant Valadez objected to her qualification as an expert in fingerprint analysis, but the trial court overruled the objection and allowed Troxel to give expert opinion testimony on latent fingerprint analysis.

In Troxel's experience, she has never seen two people have the same fingerprint or palm print.

Over an objection by defendant Valadez concerning the foundation for Troxel's knowledge, Troxel also testified that fingerprints are formed before birth and, except for growth, do not change. No two persons have ever been found to have the same fingerprint. Each is unique, based on the pattern and characteristics of the ridges in the fingerprint.

Troxel described the process used to identify an individual from a fingerprint. The method, identified in cases using the acronym ACE-V, includes analysis, comparison, evaluation, and verification. (*In re O.D.* (2013) 221 Cal.App.4th 1001, 1004, 164 Cal.Rptr.3d 578 (*O.D.*).) She testified that a print collected by an agency and sent to the California Department of Justice is analyzed and scanned so that it can be digitally compared to fingerprints already in the computer system, which is known as the automated latent print system (ALPS). ALPS identifies possible matches, which the analyst then compares to the fingerprint taken from the crime scene to determine whether there is a match.

In this case, Troxel was not the original fingerprint analyst who compared the print taken from the exterior driver's side window (exhibit No. 4) with the print suggested by ALPS, which is a known palm print from defendant Valadez. Instead, she verified the work of another fingerprint analyst. She compared exhibit No. 4 with the known palm print of defendant Valadez and concluded, as had the other analyst, that they matched based on the characteristics of the prints. The print taken from the car and the known palm print of defendant Valadez had 32 characteristics in common, or four times the minimum standard for identifying a match. That standard, as set by the California Department of Justice, is eight characteristics in common.

Counsel for defendant Valadez questioned Troxel on what she knew about mistakes that may have been made in fingerprint identification in other jurisdictions. She was aware mistakes had been made, but very few.

In defendant Valadez's opening brief on appeal, he claims his trial counsel "tried to get Troxel to explain what she did to determine that Exhibit 4 was made by Mr. Valadez, but [Troxel] refused to say much more than that she had compared the prints." We disagree with defendant Valadez's characterization of the testimony. Counsel asked Troxel to hold up the two cards (exhibit No. 4 and the known palm print of defendant Valadez) for the jury to see. And counsel then asked Troxel to show the jury "where the match is." This simplistic question predictably elicited a bewildered response, "Where the match is?" Troxel noted that it would be impossible for the jury to see the characteristics of the prints on the cards because the cards were small and the jury was far away. She suggested, however, that the jury would be able to see the characteristics of the prints if they passed the cards around. There was no evasiveness or refusal in Troxel's answers.

### B. *Law and Analysis*

#### 1. Reliability of Fingerprint Evidence

We approach defendant Valadez's contention that fingerprint evidence must be excluded as unreliable with two separate, but complementary, lines of reasoning. First, we conclude, as did Division Four of the First Appellate District in *O.D.* (Humes, J.), that expert fingerprint evidence is not subject to a foundational hearing under *Kelly, supra*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, because fingerprint evidence is not a novel scientific technique and does not have a misleading aura of certainty. And second, we conclude, as did the Seventh Circuit Court of Appeals (Posner, J.) in *United States v. Herrera* (7th Cir. 2013) 704 F.3d 480 (*Herrera*), that fingerprint evidence, in general, is not so unreliable that it must be excluded.

In *O.D.*, the minor claimed fingerprint evidence should have been excluded under *Kelly* "because there was no longer 'general acceptance' of fingerprint comparison 'in the relevant scientific community.' ([*Kelly, supra*, 17 Cal.3d] at p. 30 [130 Cal.Rptr. 144, 549 P.2d 1240].)" (*O.D., supra*, 221 Cal.App.4th at p. 1004, 164 Cal.Rptr.3d 578.) In support, the minor submitted a report of the National Academy of Sciences questioning the reliability of identification through fingerprint comparisons. The trial court took the motion to exclude the evidence under advisement, and the expert testified concerning the method of analysis, as well as the application of that analysis to the fingerprint evidence in question. (*Ibid.*) The expert "acknowledged that fingerprint comparison is 'subjective,' that there is no established error rate, and that no studies suggest that the process is infallible." (*Id.* at p. 1005, 164 Cal.Rptr.3d 578.) At the close of evidence, the court denied the motion to exclude the fingerprint evidence and relied on it to find the minor had committed the alleged burglary. (*Ibid.*)

On appeal, the minor renewed the contention that the fingerprint evidence should have been excluded. In rejecting the contention, the *O.D.* court reviewed *Kelly* and its progeny and the admissibility of fingerprint evidence.

"In *Kelly*, the California Supreme Court adopted the rule of *Frye v. U.S.* (D.C.Cir. 1923) 54 App.D.C. 46 [293 F. 1013] (*Frye*) governing the admissibility of expert testimony that relies on 'a new scientific technique.' (*Kelly, supra*, 17 Cal.3d at p. 30 [130 Cal.Rptr. 144, 549 P.2d 1240].) When a party seeks to introduce evidence relying on a new scientific technique, *Kelly* requires the party to show 'general acceptance of the new technique in the relevant scientific community' as well as the witness's qualification as an expert and use of '[the] correct scientific procedures' in employing the technique. (*Kelly*, at p. 30 [130 Cal.Rptr. 144, 549 P.2d 1240].)" (*O.D., supra*, 221 Cal.App.4th at p. 1006, 164 Cal.Rptr.3d 578, fn. omitted.)

"The primary purpose of the *Kelly* rule is 'to protect the jury from techniques which, though "new," novel, or "experimental," convey a '"misleading aura of certainty.'"' [Citation.] This danger arises when techniques 'seem scientific and infallible, but ... actually are not.' [Citation.] The *Kelly* rule 'is intended to forestall the jury's uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' [Citation.] 'Because the inventions and discoveries which could be considered "scientific" have become virtually limitless,' the determination whether expert testimony relies on a '"scientific technique"' is made in light of this 'narrow "common sense" purpose' of protecting the trier of fact from techniques that misleadingly convey certainty. [Citation.] The *Kelly* rule is frequently inapplicable to expert testimony because the testimony is often neither based on a new scientific technique nor likely to convey an aura of certainty. '[A]bsent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly*[].' [Citation.]" (*O.D., supra*, 221 Cal.App.4th at pp. 1006–1007, 164 Cal.Rptr.3d 578.)

In *O.D.*, the fingerprint analysts used the ACE-V method (analysis, comparison, evaluation, verification). (*O.D., supra*, 221 Cal.App.4th at p. 1004, 164 Cal.Rptr.3d 578.) The *O.D.* court found that "the *Kelly* rule is inapplicable to the ACE-V method of fingerprint comparison because, regardless whether it is generally accepted, fingerprint comparison is not the type of scientific technique *Kelly* governs since it can easily be understood by nonexperts and is unlikely to convey a misleading aura of certainty. [Citation.]" (*Id.* at p. 1007, 164 Cal.Rptr.3d 578.) "Our Supreme Court, in [*People v.*] *Venegas* [(1998) 18 Cal.4th 47 [74 Cal.Rptr.2d 262, 954 P.2d 525]], expressly distinguished DNA evidence, which is subject to *Kelly*, from 'fingerprint, shoe track, bite mark, or ballistic comparisons, which [laypersons] essentially can see for themselves.' (*People v. Venegas, supra*, 18 Cal.4th at pp. 80–81 [74 Cal.Rptr.2d 262, 954 P.2d 525], italics added.)" (*O.D., supra*, at p. 1007, 164 Cal.Rptr.3d 578.)

In *O.D.*, the fingerprint expert "testified that the process of comparing prints is a 'visual' one, and the juvenile court was able to see the palm prints being compared and observe their similarities. In addition, there was no suggestion that the prints were tampered with or altered. [Citations.]" *(O.D., supra*, 221 Cal.App.4th at p. 1007, 164 Cal.Rptr.3d 578.)

Finally, the *O.D.* court wrote: "[The fingerprint expert's] testimony was particularly unlikely to convey a misleading aura of certainty because [she] openly acknowledged that fingerprint comparisons are inherently subjective and that no study establishes their infallibility. She also made clear that it was her opinion–not an established scientific fact–that the palm print [at the crime scene] matched [the minor's]. 'When a witness gives [her] personal opinion on the stand–even if [she] qualifies as an expert–[laypersons] may temper their acceptance of [her] testimony with a healthy skepticism born of their knowledge that all human beings are fallible.' [Citation.]" (*O.D., supra*, 221 Cal.App.4th at p. 1007, 164 Cal.Rptr.3d 578.)

Based on this analysis, the *O.D.* court held that fingerprint evidence is admissible without a foundational hearing because "the comparison of fingerprints is not the type of 'scientific technique' that *Kelly* governs. [Citation.]" (*O.D., supra*, 221 Cal.App.4th at pp. 1007–1008, 164 Cal.Rptr.3d 578.)

Citing the same National Academy of Sciences report as was cited by the minor in *O.D.*, as well as other related reports, to try to discredit fingerprint evidence, defendant Valadez claims that the present method of using latent fingerprints to identify perpetrators of crimes has not been shown to be reliable. In making this claim, defendant Valadez provides an essay on fingerprint analysis, citing the various reports which he maintains call into doubt the reliability of fingerprint analysis.

This approach is unavailing. As the *O.D.* court noted, fingerprint evidence is not subject to exclusion based on a challenge to its reliability because it is not a new scientific technique and it does not convey a misleading aura of certainty. (*O.D., supra*, 221 Cal.App.4th at pp. 1006–1007, 164 Cal.Rptr.3d 578.) As the Supreme Court has held, the jury can observe the fingerprints and make its own comparison to determine for itself the similarities. (*Id.* at p. 1007, 164 Cal.Rptr.3d 578; *People v. Venegas, supra*, 18 Cal.4th at pp. 80–81, 74 Cal.Rptr.2d 262, 954 P.2d 525.)

A defendant may respond to fingerprint evidence by challenging the training of the fingerprint expert (which defendant Valadez did in this case), by challenging the process by which the fingerprint expert made the comparison (which defendant Valadez did in this case to some extent), or by showing that the fingerprints do not match, either by calling the defense's own expert or simply showing the jury where they do not match (which defendant Valadez apparently did not do here).

In his briefing on appeal, defendant Valadez avoids discussion of *Kelly*; instead, he asserts, generally, that fingerprint evidence is so

unreliable that it does not meet the threshold of admissibility. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769–772, 149 Cal.Rptr.3d 614, 288 P.3d 1237 [trial courts play vital gatekeeping role to insure reliability of underlying conceptual or methodological basis of expert testimony].) We conclude that fingerprint evidence is sufficiently reliable to be admissible, as was found by the Seventh Circuit Court of Appeals in *Herrera*. We quote the *Herrera* decision at length in this regard because we find it persuasive:

"The ... issue relating to the fingerprint evidence is whether [the fingerprints found on the evidence] were the defendant's. They were latent rather than patent fingerprints. Patent fingerprints are made by pressing a fingertip covered with ink on a white card or similar white surface, and are visible.[2] Latent fingerprints are prints, usually invisible, left on a smooth surface when a person touches it with a finger or fingers. Laboratory techniques are employed to make a latent fingerprint visible so that it can be compared with other fingerprints. The latent prints on the [evidence] in this case were found by a fingerprint examiner to match the defendant's patent prints made in the course of the criminal investigation, and the government therefore offered the match as evidence of the defendant's participation in the [crimes]. The defendant argues that methods of matching latent prints with other latent prints or with patent prints have not been shown to be reliable enough to be admissible as evidence under the standard for reliability set forth in [federal rules and decisions]." (*Herrera, supra*, 704 F.3d at pp. 483–484.)

> [FN 2.] We recognize that other modern means of collecting a person's fingerprints are also used, such as digital scanning.

"The [ACE-V] methodology requires recognizing and categorizing scores of distinctive features in the prints [citations], and it is the distinctiveness of these features, rather than the ACE-V method itself, that enables expert fingerprint examiners to match fingerprints with a high degree of confidence. That's not to say that fingerprint matching (especially when it involves latent fingerprints, as in this case) is as reliable as DNA evidence, for example. Forensic DNA analysis involves comparing a strand of DNA (the genetic code) from the suspect with a strand of DNA found at the crime scene. The comparison is done with scientific instruments and determines whether the segments are chemically identical. Errors are vanishingly rare provided that the strands of code are reasonably intact." (*Herrera, supra*, 704 F.3d at p. 485.)

"Chemical [DNA] tests can determine whether two alleles are identical, but a fingerprint analyst must visually recognize and classify the relevant details in the latent print–which is difficult if the print is incomplete or smudged. '[T]he assessment of latent prints from crime scenes is based largely on human interpretation.... [T]he process does not allow one to stipulate specific measurements in advance, as is done for a DNA analysis. Moreover, a small stretching of distance between two fingerprint features, or a twisting of angles, can result from either a difference between the fingers that left the

prints or from distortions from the impression process.' [Citation.]

"Matching latent fingerprints is thus a bit like an opinion offered by an art expert asked whether an unsigned painting was painted by the known painter of another painting; he makes or rejects a match on the basis of visual evidence. Eyewitness evidence is similar. The eyewitness saw the perpetrator of a crime. His recollection of the perpetrator's appearance is analogous to a latent fingerprint. He sees the defendant at the trial–that sighting is analogous to a patent fingerprint. He is asked to match his recollection against the courtroom sighting–and he is allowed to testify that the defendant is the perpetrator, not just that there is a close resemblance. A lineup, whether photo or in-person, is a related method of adducing matching evidence, as is handwriting evidence.

"Matching evidence of the kinds that we've just described, including fingerprint evidence, is less rigorous than the kind of scientific matching involved in DNA evidence; eyewitness evidence is not scientific at all. But no one thinks that only scientific evidence may be used to convict or acquit a defendant. The increasingly well documented fallibility of eyewitness testimony, [citations], has not banished it from criminal trials. [Citation.]

"Evidence doesn't have to be infallible to be probative. Probability of guilt is a function of all the evidence in a case, and if items of evidence are independent of one another in the sense that the truth of any one item is not influenced by the truth of any other, the probability of guilt may be much higher if there is evidence from many independent sources (several eyewitnesses, an eyewitness plus fingerprints, etc.) than it would be were there only the evidence of one eyewitness, say." (*Herrera, supra*, 704 F.3d at pp. 485–486, italics omitted.)

"Fingerprint experts such as the government's witness in [*Herrera*]–who has been certified as a latent print examiner by the International Association for Identification, the foremost international fingerprint organization (there are only about 840 IAI-certified latent examiners in the world, out of 15,000 total examiners)–receive extensive training; and errors in fingerprint matching by expert examiners appear to be very rare. Of the first 194 prisoners in the United States exonerated by DNA evidence, none had been convicted on the basis of erroneous fingerprint matches, whereas 75 percent had been convicted on the basis of mistaken eyewitness identification. [Citation.] The probability of two people in the world having identical fingerprints is not known, but it appears to be extremely low. [Citations.] The great statistician Francis Galton estimated the probability as 1 in 64 billion. [Citations.] That was not an estimate of the probability of a mistaken matching of a latent to a patent or another latent fingerprint. Yet errors in such matching appear to be very rare, though the matching process is judgmental rather than scientifically rigorous because it depends on how readable the latent fingerprint is and also on how distorted a version of the person's patent fingerprint it is. Examiners' training includes instruction on how to determine whether a latent print contains enough detail to enable a reliable matching to another print. Ultimately the matching

depends on 'subjective judgments by the examiner,' [citation], but responsible fingerprint matching is admissible evidence, in general and in this case." (*Herrera, supra*, 704 F.3d at pp. 486–487.)

The evidence in this case is similar to the evidence in *Herrera*. A print was collected from the victim's car, and a fingerprint analyst certified by the International Association for Identification determined that the collected print matched the known palm print of defendant Valadez. Based on the analysis from *Herrera*, we conclude that fingerprint evidence, in general, is sufficiently reliable to be admitted.

### 2. Foundation for Expert Testimony in This Case

Defendant Valadez contends that, even if the trial court did not abuse its discretion by not holding a hearing to determine whether fingerprint evidence is reliable, it abused its discretion by overruling defendant Valadez's objections, based on lack of foundation, to Troxel's testimony. He claims that she failed to establish any reasonable foundation for her opinion. We disagree, based largely on the discussion above.

Defendant Valadez's argument in this regard is as follows:

"[T]he prosecution and Troxel failed to establish the foundation for Troxel's opinion that the latent palm print matched Mr. Valadez's palm print. Before she declared the prints a match she said virtually nothing about the basis for her finding, and afterward, even when pushed, she offered only generic testimony about looking at the prints side by side and noting generally similar characteristics between the two."

This argument is without merit. As discussed in the authorities reviewed above, fingerprint evidence involves no more than comparing latent prints (those found at the crime scene) with patent prints (previously collected). Troxel explained that she compared the characteristics of the prints and found that they matched. Because (1) fingerprint evidence, generally, is not so unreliable as to be inadmissible and (2) Troxel, a trained fingerprint analyst, explained the process she used in comparing the fingerprints and reaching her conclusion, the trial court did not abuse its discretion in overruling defendant Valadez's foundational objections. (See *People v. Smith* (2005) 35 Cal.4th 334, 357–358, 25 Cal.Rptr.3d 554, 107 P.3d 229 [no abuse of discretion to admit relevant expert testimony for which foundation laid].) As the trial court told counsel, defendant Valadez could attempt to impeach Troxel by questioning her about her qualifications and the comparison of these prints or by introducing testimony of a defense expert, but Troxel's testimony was nonetheless admissible.

(People v. Rivas, 238 Cal. App. 4th at 972-81.)

////

<u>Legal Standards & Analysis</u>

A state court's admission of evidence under state evidentiary law will form the basis for federal habeas relief only where the evidentiary ruling "so fatally infected the proceedings as to render them fundamentally unfair" in violation a petitioner's due process rights. <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991). "[F]ailure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting habeas relief." <u>Id.</u>

The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly," <u>Dowling v. United States</u>, 493 U.S. 342, 352 (1990), and "has made very few rulings regarding the admission of evidence as a violation of due process." <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009). It has opted not to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." <u>Estelle v. McGuire</u>, 502 U.S. at 75 & n.5 (noting that the Court "express[ed] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). Moreover, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." <u>Holley</u>, 568 F.3d at 1101 (citing <u>Carey v. Musladin</u>, 549 U.S. at 77). In the absence of clearly established law that admission of even overtly prejudicial evidence constitutes a due process violation, the court cannot conclude that the state court's ruling was an "unreasonable application." <u>Id.</u>; <u>see also</u> <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1066 (9th Cir. 2008) (holding that because the Supreme Court has expressly reserved the question of whether using evidence of a defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process, the state court did not unreasonably apply clearly established law in determining that the admission of

defendant's criminal history did not violate due process).  A federal court is "without power" to grant a habeas petition based solely on the admission of evidence.  Id.

Even setting aside the issue of clearly established federal law, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), as amended, 421 F.3d 1154 (9th Cir. 2005).  Again, "'[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process.'"  Holley, 568 F.3d at 1101.  "Only if there are *no* permissible inferences the jury may draw from evidence can its admission violate due process."  Alcala v. Woodford, 334 F.3d 862, 887 (9th Cir. 2003) (emphasis in original); Houston v. Roe, 177 F.3d 901, 910 n.6 (9th Cir. 1999).  "Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'"  Jammal v. Van de Kamp, 926 F.2d at 920 (citation omitted). That can only occur if the admission of the evidence had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

Initially, the undersigned notes a careful review of Norma Vidales and Elizabeth Troxel's testimony was conducted.  The California Court of Appeal for the Third Appellate District's decision in that regard does not involve any unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

Additionally, the appellate court's determination that the trial court did not commit prejudicial error in admitting the fingerprint evidence is not contrary to, nor does it involve an unreasonable application of, Supreme Court precedent.  Initially, a federal court, in conducting habeas review, is limited to deciding whether a state court decision violates the Constitution, laws or treaties of the United States.  28 U.S.C. § 2254(a); Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (per curiam).  Federal habeas corpus relief "does not lie for errors of state law."  Lewis v.

Jeffers, 497 U.S. 764, 780 (1990); Estelle v. McGuire, 502 U.S. at 67. Accordingly, to the extent petitioner challenges the California courts' application of state law, or alleges that any state court abused its discretion, such a claim does not set forth a cognizable ground for habeas corpus relief. Cooke, 562 U.S. at 219; Jeffers, 497 U.S. at 780; see also Williams v. Borg, 139 F.3d 737, 740 (9th Cir. 1998) (Federal habeas relief is available "only for constitutional violation, not for abuse of discretion.").

Specifically, the appellate court's determination that the fingerprint identification was reliable and that the foundation for its admission via expert testimony involved a question of the application of state law. More particularly, the Third Appellate District applied the holding of People v. Kelly, 17 Cal.3d 24 (1976), a California Supreme Court case, as well as the holding in In re O.D., 221 Cal. App. 4th 1001 (2013).

Moreover, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley v. Yarborough, 568 F.3d at 1101 (quoting 28 U.S.C. § 2254(d)). "The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process" and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Id. Nor has the Supreme Court held that due process is violated by "the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." Moses v. Payne, 555 F.3d 742, 761–62 (9th Cir. 2009). Therefore, it is unlikely that the state court's rejection of petitioner's admission of improper fingerprint evidence claims could ever be the basis for federal habeas relief. 28 U.S.C. § 2254(d)(1); see also Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, ... it cannot be said that the state court unreasonabl[y] appli[ed] clearly

1
2
3
4
5
6
7
8
9
established Federal law.  Under the explicit terms of § 2254(d)(1), therefore, relief is

unauthorized." [citation & internal quotation marks omitted; brackets in original]); <u>Carey v.</u>

<u>Musladin</u>, 549 U.S. at 77 ("Given the lack of holdings from this Court ..., it cannot be said that

the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" [citation omitted]);

<u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates

clearly established federal law relating to the legal issue the habeas petitioner raised in state court,

the state court's decision cannot be contrary to or an unreasonable application of clearly

established federal law." [citation omitted]).

10
11
12
13
14
15
16
     Petitioner's asserted claims of a violation of his rights to a fair trial and due process of law

are not contrary to, nor do they involve an unreasonable application of, Supreme Court precedent.

First, the admission of the fingerprint evidence concerns state law and this court is bound by the

California appellate court's determination.  <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005).  Second,

the United States Supreme Court has never held that the admission of purportedly prejudicial

evidence amounts to a violation of due process.  <u>Holley v. Yarborough</u>, 568 F.3d at 1101.

17
18
19
20
21
22
23
24
25
26
27
28
     Although petitioner argues that the admission of the fingerprint testimony violated his due

process rights, he may not transform a state-law issue into a federal one merely by asserting a

violation of due process.  <u>Langford v. Day</u>, 110 F.3d 1380, 1389 (9th Cir. 1996).  Again, the

erroneous admission of evidence violates due process only if the evidence is so irrelevant and

prejudicial that it renders the trial as a whole fundamentally unfair.  <u>Estelle v. McGuire</u>, 502 U.S.

at 75.  Here, petitioner was provided a full opportunity to challenge and cross examine analyst

Troxel and did so.  By overruling defense objections based upon reliability and foundation, the

trial court allowed the jury to decide the value of that evidence and did not render the trial

fundamentally unfair in doing so.

19

The appellate court's determination that the expert fingerprint evidence, and in particular the identification of petitioner's palm print as matching the print lifted from the victim's driver side window, was neither unreliable nor lacking in foundation, and was thus not unreasonable. In sum, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law; nor was its determination based on an unreasonable application of the facts. 28 U.S.C. § 2254(d). As a result, the undersigned recommends petitioner's claim be DENIED.

B.     *Sufficiency of the Evidence*

Petitioner claims that the evidence in support of his convictions – namely, the palm print evidence lifted from the victim's driver side window identified as belonging to petitioner, his membership in "the same gang as the co-defendants," and the surveillance video from the AM/PM – was insufficient in violation of his due process rights. (ECF No. 1 at 7-8, 18.) Respondent maintains the Third District Court of Appeal's denial was not contrary to any clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. (ECF No. 13 at 26-30.)

The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Defendant Valadez contends the evidence was insufficient to convict him on any of the charges. He claims that, as to all of the charges, the evidence was insufficient to establish that he was present at the scene of the crimes, and, as to the aggravated mayhem count, the evidence was insufficient that he aided and abetted the crime. We conclude that the evidence supports the convictions.
>
> *A.   Legal Background*
>
> "In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" [Citation.]   We apply an identical

standard under the California Constitution. [Citation.] 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact that trier could reasonably deduce from the evidence."' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175, italics omitted.) In reviewing the sufficiency of the evidence, "a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*Id*. at p. 1181.) We will reverse for insufficient evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]"' (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

*B. Analysis*

    1.   Presence at the Scene

Defendant Valadez's palm print on the victim's car, along with the common gang affiliation with the other assailants, was sufficient to establish that he was present at the scene. His main two criticisms of the evidence in this regard are that (1) gang affiliation is not sufficient to establish presence and (2) the palm print evidence lacked foundation. We need not determine whether gang affiliation, alone, was sufficient to place defendant Valadez at the scene of the crimes because it was not the only evidence. The more convincing evidence of his presence was the palm print on the car. Certainly, his palm print on the car, combined with his gang affiliation with the other assailants, was sufficient to establish he was present at the scene. Therefore, defendant Valadez's argument that the evidence was insufficient to convict of any the crimes is without merit because it was sufficient to place him at the scene of the crimes.

    2.   Aiding and Abetting Aggravated Mayhem

The evidence was also sufficient to establish that defendant Valadez directly aided and abetted defendant Rivas in committing aggravated mayhem. We therefore need not consider whether the evidence was also sufficient to establish that aggravated mayhem was the natural and probable consequence of the assault or robbery.

To establish that defendant Valadez aided and abetted defendant Rivas in committing aggravated mayhem, the prosecution had to prove beyond a reasonable doubt that (1) defendant Rivas committed the crime of aggravated mayhem, (2) Valadez knew that defendant Rivas intended to commit the crime; (3) before or during the commission of the crime, defendant Valadez intended to aid and abet defendant Rivas in committing the crime; and (4) defendant Valadez's words or conduct did in fact aid and abet defendant Rivas's commission of the crime. (CALCRIM No. 401.)

Considering all of the evidence, the jury could reasonably infer that defendant Valadez held Hernandez's car door shut while defendant

Rivas entered through the passenger door and cut Hernandez's face, even if no witness could identify defendant Valadez from the surveillance video. His palm print was found on the outside of the driver's side window, right where one would expect to find it if he held the door shut. Combined with the video showing someone holding the door shut with his palm against the upper part of the closed window, the recovered palm print supports the inference that defendant Valadez was the one doing it. In addition to this inference, the jury could also reasonably infer that defendant Valadez was holding the door shut and trapping Hernandez inside to permit defendant Rivas to have access to Hernandez and cut him. Finally, a prosecution expert testified that the coordinated slashing by which defendant Rivas injured Hernandez was typical of how a gang might injure its victim. Even the defense expert agreed gangs used coordinating slashing to scar their victims and scare others, although he did not know it was done outside prisons. The jury could infer that defendant Valadez's actions aided and abetted aggravated mayhem because defendant Rivas's method of slashing Hernandez was indicative of how gangs mark their victims.

Therefore, there is sufficient evidence of all of the elements of aiding and abetting: (1) defendant Rivas committed aggravated mayhem; (2) defendant Valadez knew defendant Rivas intended to commit the crime, as can reasonably be inferred from his presence at the scene with defendant Rivas, his common gang membership, and his trapping the victim in the car while defendant Rivas slashed the victim; (3) defendant Valadez intended to aid and abet defendant Rivas as shown by the same actions; and (4) defendant Valadez[] actually aided and abetted the crime by trapping Hernandez in the car to give defendant Rivas access to him to commit aggravated mayhem.

(People v. Valadez, slip op., Lodged Doc. 24 at 20-23.)

> Legal Standards and Analysis

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Thus, one who alleges that the evidence introduced at trial was insufficient to support the jury's findings states a cognizable federal habeas claim. Herrera v. Collins, 506 U.S. 390, 401-02 (1993). Nevertheless, the petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review, a state court must determine whether "any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v.</u>

<u>Virginia</u>, 443 U.S. 307, 319 (1979).  Federal habeas relief is available only if the state court

determination that the evidence was sufficient to support a conviction was an "objectively

unreasonable" application of <u>Jackson</u>.  <u>Juan H.</u>, 408 F.3d at 1275 n.13.

Habeas claims based upon alleged insufficient evidence therefore "face a high bar in

federal habeas proceedings because they are subject to two layers of judicial deference."

<u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012) (per curiam).  As noted by the Supreme Court:

> First, on direct appeal, "it is the responsibility of the jury−not the court−to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"

(Citations omitted).

The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements

of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16.  In performing a

<u>Jackson</u> analysis, a jury's credibility determinations are "entitled to near-total deference." <u>Bruce</u>

<u>v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004).  When the factual record supports conflicting

inferences, the federal court must presume that the trier of fact resolved the conflicts in favor of

the prosecution and must defer to that resolution.  <u>Jackson</u>, 443 U.S. at 326.

Here again, a review of the record reveals the state appellate court's determination did not

involve an unreasonable determination of the facts, nor was it based upon an unreasonable

application of, or contrary to, Supreme Court precedent.

The state appellate court's analysis pursuant to <u>Jackson</u> was entirely reasonable.  At trial,

petitioner's co-defendant, Rivas, was identified as the individual who slashed victim Osvaldo

Hernandez across the face as he was confined to the driver's side of his vehicle.  (Lodged Doc. 8

at 113, 121-27, 174.)  The victim specifically testified that his driver's side door was held closed

during the assault making escape impossible by another individual he could not identify.  (Lodged

Doc. 8 at 108-10, 122.)  However, the palm print recovered from the victim's driver side door

window was identified as matching petitioner's known palm print.  (Lodged Docs. 17 at 237-300 & 18 at 301-23.)  Hence, it was more than reasonable for the jury to infer petitioner was the individual appearing in the surveillance video, holding the driver's side door of the victim's vehicle closed during the attack.  Moreover, the act of holding the victim's driver's side door closed while Rivas committed the assault is reasonably inferred to be evidence petitioner intended to aid and abet Rivas in the commission of that crime.  Finally, the state court's analysis pursuant to <u>Jackson</u> was reasonable with regarding to the evidence proffered concerning petitioner's criminal street gang activity, for an expert offered oral testimony and other evidence was admitted in support of the crime.  (Lodged Docs. 18 at 362-89, 578-600 & 19 at 601-94.)

The Third District Court of Appeal's denial of petitioner's claim of insufficient evidence to support his convictions was neither contrary to, nor did it involve an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  Nor was the state court's denial based upon an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Certainly, the state appellate court's ruling is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair-minded disagreement."  <u>Richter</u>, 562 U.S. at 103.  As a result, petitioner is not entitled to federal habeas relief and the undersigned recommends the claim presented in ground two of the petition for writ of habeas corpus be DENIED.

VI.  <u>Conclusion</u>

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

24

the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C.

§ 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

service of the objections. The parties are advised that failure to file objections within the

specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951

F.2d 1153 (9th Cir. 1991).

Dated: May 22, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Vala2661.157